Jack I. Jmaev (CA-SBN: 216,416)
PURITAN LAW
500 N. STATE COLLEGE BLVD.,
    SUITE 1100
ORANGE, CA 92868
Phone: 657-999-8929

Attorney for Plaintiffs
    Darren Marino; and
    Mark DePietro

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| DARREN MARINO; and MARK DEPIETRO, <br><br> Plaintiffs, <br><br> vs. <br><br> CHARLES CHUNHUA HUANG; PASACA CAPITAL INC.; PASACA CAPITAL LLC; and CHARLES HUANG FOUNDATION. <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> **(1) BREACH OF ORAL CONTRACT;** <br> **(2) CONVERSION AND CIVIL THEFT WITH TREBLE DAMAGES PURSUANT TO CALIFORNIA PENAL CODE § 496;** <br> **(3) BREACH OF FIDUCIARY DUTY TO MINORITY BY MAJORITY SHAREHOLDER;** <br> **(4) BREACH OF DUTIES OF CARE, LOYALTY AND CANDOR;** <br> **(5) UNJUST ENRICHMENT;** <br> **(6) FRAUDULENT TRANSFER PURSUANT TO CAL. CIV. CODE § 3439 ET SEQ.;** <br> **(7) INJUNCTIVE RELIEF TO PRESERVE ASSETS; AND** <br> **(8) ACCOUNTING.** <br><br> **DEMAND FOR JURY TRIAL** |

1

## COMPLAINT

1. Plaintiffs Darren Marino and Mark DePietro, for their Complaint against Defendants Charles Chunhua Huang ("Huang"), an individual; Pasaca Capital Inc. ("Pasaca" or "PCI"), a Nevada Corporation; Pasaca Capital LLC, ("Pasaca Capital" or "PCC") a California limited liability company; and the Charles Huang Foundation ("CHF"), a California Non-Profit Corporation allege as follows:

## JURISDICTION

2. This Court has jurisdiction pursuant 28 U.S.C. 1332 because, as alleged in Paras. 7 – 12, *infra*, there is complete diversity of citizenship and the amount in controversy for Plaintiff Marino is $451,098,948 and the amount in controversy for Plaintiff DePietro is $180,439,579, both of which on a non-collective basis exceed $75,000.

3. This Court also has jurisdiction over the person of a defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure ("FRCP"). Because all Defendants, including Defendant Huang, Defendant Pasaca, Defendant Pasaca Capital and Defendant Charles Huang Foundation reside or are doing business in the State of California and within this district (see Paras. 9 – 12), this Court has jurisdiction to issue a monetary judgment and/or an order to enjoin all of the these Defendants pursuant to its *in persona* jurisdiction over these Defendants. This Court also has in *in persona* jurisdiction over certain non-parties that are believed to be alter egos of Defendant Huang, as elucidated *infra*.

4. This Court has jurisdiction to render declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

5. This Court has pendant and supplemental jurisdiction over the other claims asserted herein, pursuant to 28 U.S.C. § 1367.

## VENUE

6.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, as alleged herein, a substantial part of the events giving rise to this action occurred within this District.

## THE PARTIES

7.    Plaintiff Darren Marino, an individual, is a resident of the Commonwealth of Pennsylvania.

8.    Plaintiff Mark DePietro, an individual, is a resident of the Commonwealth of Pennsylvania.

9.    Defendant Charles Chunhua Huang, an individual, resides in Arcadia, California, which is in Los Angeles County and which is in this district.

10.    Defendant Pasaca Capital Inc. is a Nevada corporation that maintains its primary offices in Pasadena, CA, which is in Los Angeles County and which is in this district.

11.    Defendant Pasaca Capital LLC, is a California limited liability company that maintains its primary offices in Pasadena, CA, which is in Los Angeles County and which is in this district.

12.    The Chares Huang Foundation is a California Non-Profit Corporation and maintains its primary offices in Pasadena, CA, which is in Los Angeles County and which is in this district.

## NON-PARTIES

13.    Innova Medical Group ("IMG") is a wholly owned subsidiary of Defendant PCI. IMG was formed for the specific purpose of producing and distributing rapid antigen test kits.

14.    Prima Air (a California corporation), Prima Air LLC (a California limited liability company) and Prima Air Group LLC (a California limited liability

company) are non-parties controlled by Defendant Huang and are being used to cloak Defendant PCI profits, stolen by Defendant Huang, from discovery by Defendant PCI's shareholders.

15. Non-Party Daniel Elliott ("Elliott") was one of the original founders of Defendant PCI. Daniel Elliott became acquainted with Plaintiff Marino while they were both employed by EnerBlu, an advanced battery company.

16. Non-Party Robert Kasprzak ("Kasprzak") also worked at EnerBlu and was recruited into PCI by Elliott. As a licensed attorney, Kasprzak served as PCI's Chief Legal Officer. For a brief time prior to discovering Defendant Huang's fraud and malfeasances, Kasprzak served as President and CEO of IMG prior to parting ways with Defendant Huang and Defendant PCI. Kasprzak also served as CEO of Defendant PCI.

## FACTS COMMON TO ALL CLAIMS

### I.  GENERAL BACKGROUND

17. Whenever in this complaint reference is made to "Defendants," such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

18. The matter presented in all exhibits attached hereto is incorporated herein by reference.

19. Defendant PCC, Defendants PCI, PCC, CHF and non-party IMG, along with Defendant Huang's family, friends, girlfriends and mistresses are often referred to herein as Defendant Huang's "confederates", "allies" or "co-conspirators".

### A.    Related Cases Are Relevant

20. Attached hereto as Ex. A is a complaint filed by Kasprzak against Defendants Huang and PCI, which are included amongst the defendants in this action. Kasprzak's complaint, primarily for breach of oral contract, is

4

pending in Los Angeles County Superior Court as Case 23STCV09342. The text and exhibits presented in Ex. A are incorporated herein by reference.

21. It was not until Plaintiffs discovered Kasprzak's complaint did they realize they had been duped by Defendant Huang and deprived of their fair share of Defendant PCI's profits. Based on Kasprzak's complaint and additional independent research, Plaintiffs present the allegations in this complaint based on actual knowledge and also on information and belief.

22. Plaintiffs discovered even more pilfering of PCI's assets by Defendant Huang when they discovered a Jane Doe plaintiff filed a lawsuit against Defendant Huang et al. for, *inter alia*, sexual battery, sex trafficking and related malfeasances. That case is pending in the Los Angeles Superior Court as 24NNCV00981. See Ex. B. The text and exhibits presented in Ex. B are incorporated herein by reference.

**B.     Defendants PCI, and Others are Alter Egos of Defendant Huang**

23. Plaintiffs allege that, at all times herein mentioned, Defendants PCI, PCC and CHF, non-party IMG, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC were and are the alter egos of Defendant Huang, and that at all times herein mentioned there existed such a unity of interest between Defendants Huang, and Defendants PCI, PCC, CHF, non-party IMG, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC that any separateness has ceased to exist between them for the following reasons:

a) As alleged herein, Defendant Huang used the assets of PCI and its wholly-owned subsidiary Innova for his own benefit, either directly or for the benefit of his other alter egos PCC and CHF, and has caused the assets of PCI and IMG to be transferred to himself, his wholly owned companies PCC and CHF, his family, his girlfriends and mistresses and others without adequate consideration and for

improper purposes; Defendant CHF is hardly the public benefit company Defendant Huang would have the world to believe. It is just a shell to foster Defendant Huang's investments in entrepreneurial ventures to the detriment of Defendant PCI's minority shareholders.

b) As alleged herein, Defendant Huang has exercised complete dominance and control over Defendants PCI, PCC and CHF, non-party IMG, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC such that PCI, Innova, PCC, CHF, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC are mere shells and instrumentalities for the conduct of Defendant Huang's business and personal interests;

c) As alleged herein, Defendant Huang, PCI, PCC, CHF, IMG, non-party IMG, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC are alter egos of each other based on their unity of interest, and the injustice that would result if they were treated separately; and

d) As alleged herein, Defendant Huang has carried on activities and business of PCI and Innova without holding directors and shareholders' meetings and entered into personal transactions with Pasaca Group without the approval of the other directors or shareholders. Defendant Huang has converted and stolen Defendant PCI's profits in order to fund his alter ego entities, all to the detriment of Defendant PCI's minority shareholders.

24. Plaintiffs Marino and DePietro believe Defendant Huang did not remunerate any consideration in exchange for his claimed PCI shares and the PCI shares purportedly held by Defendant PCC. Consequently, neither Defendant Huang nor Defendant PCC own any shares in Defendant PCI. Even still,

Defendants PCI, PCC, CHF, non-party IMG, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC are still the alter egos of Defendant Huang. This is because Defendant Huang exerted such control over these entities that there is still unity of interest between Defendant Huang and Defendants PCI, PCC, CHF, non-party IMG, non-party Prima Air, non-party Prima Air LLC and non-party Prima Air Group LLC.

**C.   Plaintiffs Have Standing to Bring Direct Cause of Action**

25.   As further alleged herein, Plaintiffs Marino and DePietro are entitled to bring this action directly against Defendant PCI because Defendant PCI breached an oral promise to redeem Plaintiffs' shares in PCI. Plaintiffs Marino and DePietro are entitled to bring this action directly against Defendants Huang, PCC and CHF based on his breach of fiduciary duty, not only to PCI, but also to Plaintiffs as minority shareholders in a *closely-held* corporation.

26.   In the matter here, Defendant Huang breached his duty to PCI and to the minority shareholders, including Plaintiffs Marino and DePietro, by paying himself excessive compensation and by diverting corporate profits away from the minority shareholders to his own account and to the account of PCC, a limited liability company that he owns entirely, and to the account of CHF, which is a nonprofit corporation that Defendant Huang uses to surreptitiously transfer PCI's profits to alleged charities, which then transfer these funds to entrepreneurial ventures.

27.   Plaintiffs believe that any charitable distributions are made for the purpose of cloaking illegitimate and fraudulent offshore transfers. Plaintiffs further believe that many of the supposed "grants" to entrepreneurial ventures are made in order to circumvent the legitimate purpose of Defendant PCI, which was formed to invest is businesses as a private equity fund. And, Defendant Huang appears to have made grants from CHF to start companies in which

COMPLAINT

he retains an ownership interest. As the saying goes, *where there is smoke, there is fire* – and here, there is a massive raging inferno.

28.   Defendant Huang also breached his fiduciary duty to the minority shareholders by diverting their fair share of profits either to himself, directly or through his alter egos PCC and CHF, or to family, friends, girlfriends, mistresses and other allies.  These diverted profits amount to nothing less than excessive executive compensation that was not approved by PCI's directors or its shareholders.

29.   Plaintiffs Marino and DePietro are also entitled to bring a direct action against Defendants Huang, PCI, PCC and CHF because Huang, PCI, PCC and CHF are all alter-egos of each other.

30.   Plaintiffs Marino and DePietro are also entitled to bring a direct action against Defendant Huang pursuant to Nevada law because Defendant PCI is either a closely held corporation or an entity managed as such. Plaintiffs Marino and DePietro are also entitled to bring a direct action against Defendant Huang pursuant to California law because he caused Defendant PCI to pay to Defendant Huang excessive executive compensation, thus depriving minority shareholders of a proportionate share of Defendant PCI's profits.

31.   Based on information and belief, Defendant Huang may not actually be a shareholder in PCI. This, though, is subject to discovery and an accounting. If Defendant Huang is not a shareholder, this still does not preclude a direct action either through a breach of fiduciary duty to the minority shareholders and/or by piercing the corporate veil because Defendant Huang exercised complete control and dominance over Defendant PCI causing Defendant PCI to divert its profits away from legitimate shareholders in deference to Defendant Huang.

**II. PASACA'S PHENOMENAL SUCCESS AND RUIN**

8

### A.   $5 Billion in Revenue over 18 Months

32.   As the world slipped into the horror of the COVID-19 pandemic, Defendant PCI formed a wholly-owned subsidiary called Innova Medical Group, Inc. ("IMG" or "Innova"). Innova's purpose was to produce and distribute COVID-19 rapid antigen test kits.

33.   In September 2020, Innova secured a contract for rapid antigen test kits in support of the United Kingdom's national testing program. See Ex. A, ¶7. This first contract was for delivery of 18 million test kits, which Innova delivered to the UK within three weeks. All in all, Innova generated approximately $5 billion in revenue over approximately 18 months. See Ex. A, ¶8.

34.   Innova could not have delivered any test kits had it not been for Elliott and Kasprzak. Defendant Hwang's efforts were *de minimis* at best.

### B.   Defendant Huang Plunders PCI Assets

35.   As the revenue stream from the UK began to decline, Elliott and Kasprzak began considering how PCI could invest its profits into various entrepreneurial ventures commensurate with its original charter. Elliott and Kasprzak pleaded with Defendant Huang to operate PCI as originally intended, that being a private equity fund. Elliott and Kasprzak believed that PCI had significant funding available for investment in order to create future revenue streams. Such funding was to be invested in various entrepreneurial companies and in distressed companies identified as commercially viable.

36.   Despite all of the advice Defendant Huang received from Elliott and Kasprzak, and also from Plaintiffs Marino and DePietro, Defendant Huang began spending PCI's money on frivolous investments and business ideas presented to him by his friends, family, girlfriends and mistresses, all without any due diligence or any information to ensure the safety of such investments.

37.   Defendant Huang also used PCI monies to purchase airplanes, houses for himself and his girlfriends and mistresses and other luxury goods and services amounting to hundreds of millions of dollars.

38.   Defendant Huang also fraudulently transferred $200 million to offshore accounts in case he needed to flee the United States.

39.   Plaintiffs Marino and DePietro believe that the allegations presented in Kasprzak's complaint are true and factually accurate. This belief is substantiated because Kasprzak was a director and high-level officer for Defendant PCI and non-party IMG. Kasprzak, in his complaint attached as Ex. A, itemizes in considerable detail the monies frittered away and/or frivolously invested with friends, family, girlfriends and mistresses. All of these frivolous expenditures and *so-called* investments had and still have no legitimate business purpose.

40.   Plaintiffs Marino and DePietro believe that the allegations presented in Jane Does's complaint are true and factually accurate. Especially compelling is a video referenced by Kasprzak's complaint at ¶22, footnote 3. *See* https://twitter.com/AsiaFinance/status/1623725938637668352. Jane Doe's complaint provides more insight as to additional monies squandered by Defendant Huang's self-dealing and spendthrift behavior.

**C.    Defendant Huang's Ongoing Breach of Fiduciary Duties**

41.   Ex. C is a partial enumeration of frivolous expenditures and shady investments made with no due diligence in contravention of California case law, California statutes and the bylaws of PCI itself. For example, Cal. Corp. Code § 309(a) provides, in part, that:

"A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care,

10

including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances".

42.    The standard provided in  § 309(a) is parroted in the PCI's bylaws at Article II, Section 2, entitled "Standard of Care":

> Each Director shall perform the duties of a Director, including the duties as a member of any committee of the Board upon which the Director may serve, in good faith, in a manner such Director believes to be in the best interests of the Corporation, and with such care, including reasonable inquiry, as an ordinary prudent person in a like position would use under similar circumstances.

43.    As described in Kasprzak's complaint (Ex. A ¶66), Defendant Huang "spent PCI's money on questionable investments without the consent or approval of other shareholders or directors, and often without any due diligence." This falls far below the standard required by § 309(a) and the requirement for at least a reasonable inquiry as required by this statute and PCI's bylaws.

44.    Cal. Corp. Code § 309(b) further provides that:

> In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:
>
> (1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented;
>
> (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence …

45. Although PCI is a corporation organized under the laws of the State of Nevada, it is still obligated to adhere to Cal. Corp. Code §§ 309(a) and 309(b).

46. Based on information and belief, Defendant failed to share pertinent information regarding such frivolous expenditures and unvetted investments to any other director or to his in-house counsel, who at the time was Mr. Kasprzak, See Ex. A ¶77.

47. Defendant Huang also acted in bad faith because all of these frivolous expenditures and unvetted investments were just part of an elaborate scheme to defraud investors and divert profits, a portion of which should have been paid as dividends to Plaintiffs Marino and DePietro, to Defendant Huang himself, to Defendants PCC and CHF, and to his family, friends, girlfriends and mistresses.

48. All of these collectively resulted in enormous, excessive and unapproved executive compensation to Defendant Huang and evidence his failure to be candid with shareholders, directors and officers of Defendant PCI and his *unending failure* to be loyal to the corporate entity PCI.

**D.   Business Judgment Rule Does Not Apply**

49. Plaintiffs acknowledge that the business judgment rule is meant to protect corporate directors from risk associated with mishandling investments. However, the business judgment rule does not protect directors that breached their fiduciary duties of loyalty and adherence to a standard of care levied upon them by statutes, precedential case law and a company's bylaws.

50. Here, Defendant Huang has repeatedly and in bad faith frittered away hundreds of millions of dollars of PCI's resources, all without due diligence or board approval. As described in Kasprzak's introductory allegations (see Ex. A. ¶2), Defendant Huang has lost more than $200 million of PCI's money on failing businesses owned by friends and colleagues and has

diverted PCI profits to various shell insurance and aviation companies that he owns or controls. A preponderance of these investments were made without any due diligence or approval of Defendant PCI's board of directors. (see Ex. A. ¶67).

51. Defendant Huang was in complete control of Defendant PCI's finances. In fact, Defendant Huang was able to exert such control because he monitored every financial transaction and personally signed all or substantially all checks, personally initiated all or substantially all other payments and even personally went to the bank to send wires of PCI funds.

52. Even though Defendant PCI was supposedly under control of a board of directors, and managed by a complement of corporate officers, PCI's Board and its officers were powerless. Defendant Huang refused to share shareholder ledgers or financial records with any of its board members or officers. (see Ex. A. ¶82). Defendant Huang refused to hold any shareholder meetings and any board meetings that he did convene were nothing more than shams because all of the board members, save Kasprzak, were under his thumb.

53. Defendant Huang had such financial control not only over Defendant PCI, but also over IMG that he was able to unilaterally and without warning pull hundreds of millions of dollars out of PCI and IMG bank accounts and send these money to his friends and family, his mistresses and also fraudulently transfer over $200 million to overseas emergency accounts for his own personal security. (see Ex. A. ¶¶85, 86).

### III.     PLAINTIFFS JOIN PASACA CAPITAL INC.

54. Plaintiff Marino and Plaintiff DePietro came to know each other while working at General Instrument, which was eventually acquired by Motorola.

55. Plaintiffs Marino and DePietro, while working at Motorola, were responsible for identifying, acquiring or investing in strategically beneficial companies

and assets. Plaintiffs Marino and DePietro were also responsible for integrating any acquired assets and companies into Motorola's business ecosystem.

56. And, Plaintiffs Marino and DePietro are not only seasoned engineers and technologists, they are also endowed with superb business acumen and are capable of evaluating the market potential and viability of products produced by an acquisition target. As a result of this experience, Plaintiffs Marino and DePietro are both well familiar with the process of evaluating a potential acquisition target, including reviewing financial history and projections. Despite all of this experience, Defendant Huang failed to utilize information provided by Plaintiffs and recklessly squandered Defendant PCI's profits on shady investments, including investments in companies and business concepts proffered by his friends, family, girlfriends and mistresses. This further evidences his breach of his duty of care to Defendant PCI.

**A.    Darren Marino**

57. On or about October 1, 2020, Plaintiff Marino joined PCI as a full-time, exempt employee. See Ex. D.

**B.    Mark DePietro**

58. On or about October 1, 2020, Plaintiff DePietro also joined PCI as a full-time-exempt employee. See Ex. E.

**C.    Marino and DePietro's Advice Was Not Followed**

59. Plaintiffs Marino and DePietro were given the honorary title of "Partner". Despite being labeled as partners, Plaintiffs Marino and DePietro had no actual or effective control over Defendant PCI. Defendant Huang had an iron grip on Defendant PCI, and not even his original co-venturers could control his actions. Defendant Huang, and only Defendant Huang was and is responsible for depleting PCI assets and diverting its profits from its

legitimate shareholders in order to fuel his ego and unjustly enrich his own personal accounts, including Defendant PCC and Defendant CHF.

60. Despite more than two decades guiding the mergers and acquisitions process at a Fortune 500 company, Defendant Huang refused to follow sapient advice provided by Plaintiffs Marino and DePietro. Instead, Defendant Huang's ego and greed drove him to breach fiduciary responsibilities to Defendant PCI and to its minority shareholders.

61. By failing to heed the advice provided by Plaintiffs Marino and DePietro and the advice of non-parties Elliott and Kasprzak, Defendant Huang breached his fiduciary duty to PCI in contravention of Cal. Corp. Code §§ 309(a) and 309(b) and in contravention to Nevada law and Defendant PCI's on bylaws.

### IV.    PLAINTIFFS PURCHASED PCI SECURITIES

62. Even before Plaintiffs Marino and DePietro joined the ranks of Defendant PCI as employees, they had engaged in providing consulting services on an ad hoc basis in order to help Defendant PCI improve its cash flow. Because of these consulting services, for which Plaintiffs Marino and DePietro were not otherwise compensated, Plaintiffs Marino and DePietro were given an opportunity to purchase shares in Defendant PCI.

63. Plaintiffs Marino and DePietro seized the opportunity to purchase shares in Defendant PCI. This opportunity to purchase shares at an initial strike price of $0.10 per share was provided to Plaintiffs to acknowledge their pre-employment, and uncompensated contributions to Defendant PCI.

64. Plaintiffs Marino and DePietro are thankful for their opportunity to purchase shares in Defendant PCI. Accordingly, Plaintiffs find no fault or reason to bring any action under their respective stock subscription agreements, which are attached hereto as Exs. F and G. Rather, Plaintiffs Marino and DePietro only bring an action as minority shareholders in Defendant PCI that have

15

been wrongfully deprived of their fair share of Defendant PCI's profits. Simply put, the gravamen of Plaintiff Marino and DePietro's claims do not arise from their respective stock subscription agreements.

65. Even though Plaintiffs Marino and DePietro purchased their shares after becoming employees, the offer to redeem their shares was not based on their employment with Defendant PCI. Again, to reiterate, PCI's offer to repurchase Plaintiffs' shares was made in recognition of their pre-employment contributions, which were provided on an ad hoc basis.

**A. Money Invested**

66. Unlike Defendant Huang who Plaintiffs believe failed to provide consideration for the PCI shares he and Defendant PCC purportedly own, Plaintiffs Marino and DePietro actually provided consideration for the shares that they actually now own.

67. On January 13, 2021, Plaintiff Marino tendered a check for $12,500 in exchange for 125,000 shares of PCI common stock. See Ex. H.

68. On January 12, 2021, Plaintiff DePietro tendered a check for $5,000 in exchange for 50,000 shares of PCI common stock. See Ex. I.

**B. In a Common Enterprise**

69. Plaintiffs Marino and DePietro invested their monies in a common enterprise. It is clear this was a common enterprise because any gains Plaintiffs hoped to achieve were intertwined with the success of Defendant PCI and its other investors.

**C. In Hopes of Earnings Generated by Others**

70. Even though they were employed by Defendant PCI, Plaintiffs Marino and DePietro were reliant upon the skill and management of the original co-venturers. Plaintiff Marino was previously acquainted with non-party Elliott. Because of this prior acquaintance, Plaintiffs Marino and DePietro

collectively held enormous faith in non-parties Elliott and Kasprzak and their ability to manage the common enterprise.

71. Plaintiffs Marino and DePietro also recognized that non- parties Elliott and Kasprzak were responsible for securing the contract with the United Kingdom for antigen testing kits and also realized that their anticipated profits would result solely from the managerial skill of Elliott and Kasprzak.

72. But, they never imagined Defendant Huang would deprive them of their share of profits by diverting these profits to his own account or to the accounts of PCC and CHF and to the accounts of his friends, family, girlfriends and mistresses. All of these diverted profits amounted to excessive executive compensation to Defendant Huang which was a breach of his fiduciary duty to Plaintiffs as minority shareholders.

**D.    Defendant PCI Breached Oral Contract to Redeem Shares**

73. Even though Defendant Huang decided how much equity all of the initial co-venturers would receive, Kasprzak became a shareholder by actually purchasing an initial 250,000 shares with a subsequent purchase of an additional 500,000 shares. This brought Kasprzak on par with Elliott and supports his claim that Defendant Huang promised to "purchase back" Kasprzak shares at a price of $100 per share. See Ex. A, ¶37.

74. Plaintiffs Marino and DePietro also purchased, with cash tendered by check, the PCI shares that they now own. See Exs. H and I.

75. While Kasprzak was the CEO of Defendant PCI, Kasprzak orally conveyed Defendant Huang's covenant on behalf of Defendant PCI that Defendant PCI would also redeem Plaintiff Marino and DePietro's equity at $100 per share. Kasprzak conveyed this promise at Defendant Huang's direction. This covenant was motivated by Plaintiffs Marino and DePietro's material contributions to Defendant PCI's success even before they became employees. Plaintiffs Marino and DePietro were not otherwise compensated

17

for their pre-employment contributions to Defendant PCI's success. Plaintiffs' *ownership of shares is fully independent* of their employment by Defendant PCI.

76. On April 27, 2023, Defendant PCI terminated Plaintiffs' employment and demanded that Plaintiffs Marino and DePietro surrender their shares in PCI in breach of its obligation to redeem these shares at a price of $100 per share.

77. Plaintiffs were not obligated to hand their shares back over to Defendant PCI. There was no buy-sell agreement requiring Plaintiffs to relinquish their equity and the stock subscription agreement does not mention anything to tie Plaintiffs' shares to their employment. The converse is true – the shares owned by Plaintiffs were acquired in appreciation of Plaintiffs' pre-employment support of Defendant PCI's sales efforts. And, PCI's promise to purchase back the shares was again motivated by Plaintiffs' pre-employment ad hoc activities, which were not otherwise compensated.

78. When they were terminated, Plaintiffs Marino and DePietro tendered full performance to enable Defendant PCI to redeem their equity at the promised price of $100 per share. Accordingly, because Defendant PCI breached this oral contract, Plaintiffs have been damaged. Plaintiff Marino has been damaged in the amount of $12,500,000, less the original purchase price of his shares. Plaintiff DePietro has been damaged in the amount of $5 million, less the original purchase price of his shares.

79. What is even more disturbing here, Plaintiffs Marino and DePietro have no recourse because of the dictatorial and absolute control over the company exerted by Defendant Huang. The absolute control over PCI by Defendant Huang means Plaintiffs do not have a market in which to sell their PCI shares to a third-party. Any third-party, upon conducting due diligence, would realize that the shares are rendered *absolutely worthless* by Defendant

Huang's nefarious actions and his dictatorial control over Defendant PCI, its Board of Directors, its subsidiaries and his other alter ego entities.

80. For the purpose of clarification, Plaintiffs Marino and DePietro do not raise any claims based upon their former employment with Defendant PCI. This action, *inter alia*, is brought to recover a portion of PCI's profits owed to Plaintiffs based upon their standing as PCI minority shareholders and for damages resulting from Defendant PCI's failure to redeem Plaintiffs' shares.

## V. DEFENDANT PCI'S SHAREHOLDERS

### A. Defendants Huang and PCC Are Not Legitimate PCI Shareholders

81. The initial funding for PCI came from one of the other co-ventures named Kening Xu. Effectively, Defendant Huang did not provide any consideration to PCI for the shares that he misappropriated for his own account and for his wholly owned company Defendant Pasaca Capital LLC. Because Defendant Huang did not provide consideration, he does not own the shares he claims nor does Pasaca Capital LLC own the shares that entity purportedly owns.

82. Because Plaintiffs believe neither Defendant Huang nor Defendant Pasaca Capital LLC provided any consideration for PCI shares they purportedly own, a full accounting is necessary to ascertain the true and legitimate shareholders of Defendant PCI.

83. An accounting is also needed because, as Plaintiffs believe, there are many other individuals that did not provide consideration for their purported holding of PCI shares. See Ex. A ¶22.

### B. Elliott's Share Redemption

84. In May 2022, Elliott, one of the founders of PCI, had had enough. At that time, as shown in the capitalization table attached as Ex. J, Elliot held 750,000 shares. He relinquished his position as CEO of Innova and sold back to Defendant PCI his shares at a negotiated price of $100 per share, amounting to a total of $75 million.

19

COMPLAINT

85. Kasprzak also wanted to part company with Defendant Huang, but stayed on as IMG's interim CEO until a replacement could be found. According to Kasprzak's complaint, Defendant Huang promised him an equity buyout at the same $100 per share offer taken by Elliott. Of course, as we now know, Defendant Huang breached that agreement with Kasprzak and is also now suing Elliott claiming his share redemption was invalid. See Ex. A, ¶14.

## C. Defendant PCI Overstates Amount of Shares Outstanding

86. Defendant PCI's capitalization table ("Cap Table") further misrepresents holdings by other purported shareholders. Ex. J is a capitalization table as promulgated by Defendant PCI and is believed to be PCI's representation of shareholders as of May 2022. According to this rendition of the Cap Table, Defendant Huang purportedly owns 990,000 shares of PCI, which accounts to 14.5481% of the outstanding shares. Pasaca Capital LLC, purportedly owns 2 million of the outstanding shares amounting to 29.3902% of the company's equity.

87. Based on information and belief, Plaintiffs Marino and DePietro hereby allege that Defendants Huang and PCC have not provided any consideration for the shares that they purportedly own. Ergo, these purported shares are not entitled to any voting rights or dividends. Essentially, Defendant Huang has *hijacked control* of Defendant PCI from its legitimate shareholders.

88. Also based on information and belief, Plaintiffs Marino and DePietro hereby allege that Defendant Huang issued shares in Defendant PCI to his friends, family, girlfriends and/or mistresses without PCI receiving any consideration for such issued shares. *Again*, see Ex. A, ¶22. Accordingly, these purported shares are not entitled to any voting rights or dividends.

89. It is clear that Defendant Huang was set on lining not only his own pockets, but the pockets of his friends, family and other confederates at the expense

of legitimate shareholders, such as Plaintiffs here that had paid for and currently hold fully paid up and non-assessable shares in Defendant PCI.

90. Ex. K presents a version of the Cap Table that Plaintiffs Marino and DePietro believe represents the actual number of outstanding shares held by legitimate shareholders. Ex. K recognizes that shares of Defendant PCI issued by Defendant Huang, without any consideration having been paid for same, are void and not entitled to voting rights or dividends. Also, attached Ex. L acknowledges redemption of shares held by Elliott.

91. As depicted in Ex. K, which is based on Plaintiffs belief and information available to them, Plaintiff Marino is entitled to approximately 4.8685% of Defendant PCI's profits before redemption of Elliott's shares. As shown in Ex. L, Plaintiff Marino is entitled to approximately 6.8776% of Defendant PCI's profits after redemption of Elliott's shares, which occurred approximately in May 2022.

92. Likewise, as depicted in Ex. K and based on Plaintiffs belief and information available to them, Plaintiff DePietro is entitled to approximately 1.9474% of Defendant PCI's profits before redemption of Elliott's shares. As shown in Ex. L, Plaintiff DePietro is entitled to approximately 2.7510% of Defendant PCI's profits after redemption of Elliott's shares, which occurred approximately in May 2022.

## VI.   CONVERSION AND CIVIL THEFT OF PROFITS

### A.   Defendant Huang Diverted Profits Owed to Plaintiffs

93. As minority shareholders in a close-corporation, Plaintiffs Marino and DePietro had a right to receive dividends based upon profits earned by Defendant PCI. Defendant Huang, through direct and intentional acts, squandered away PCI profits and directed PCI profits to his own account or to that of Defendants PCC and CHF, and to his confederates including his family members, his friends and/or girlfriends and mistresses. Again,

Defendant Huang did all of these acts to further increase his executive compensation and to permanently deprive minority shareholders Plaintiffs Marino and DePietro of their fair share of Defendant PCI's profits.

94. All of these frivolous expenditures did nothing more than avert payment of dividends rightfully owed to Plaintiffs Marino and DePietro. Instead of paying these dividends, Huang diverted profits that should have been paid as dividends to Plaintiffs Marino and DePietro and other legitimate investors either directly to Defendant Huang himself, to his wholly owned company PCC, or to his purported charitable foundation CHF or to his collaborators and confederates including his family members, his friends and/or girlfriends and mistresses. All of these expenditures and fraudulent transfers resulted in excessive executive compensation to Defendant Huang. Defendant Huang fully intended to permanently deprive Plaintiffs Marino and DePietro of their fair share of Defendant PCI's profits.

95. Plaintiffs Marino and DePietro did not consent to Defendant Huang's interference with their right to possess a portion of these profits, according to their standing as shareholders.

**B.    Breach of Duty to Minority Shareholders**

96. By depriving Plaintiffs Marino and DePietro of their fair share of PCI profits, Defendant Huang breached his duty to PCI's minority shareholders, which include Plaintiffs here.

97. On March 8, 2024, a special shareholder meeting was convened at the request of non-party Kasprzak. In Defendant Huang's fashion, the special shareholder meeting could not be convened for lack of a quorum. A quorum could not be established because Defendant Huang did not attend the meeting. This is again additional confirmation that Defendant Huang has breached its duty to minority shareholders by failing to provide relevant business information.

22

98. On May 7, 2024, Defendant PCI held an annual shareholder meeting. Ex. M sets forth a synopsis of that meeting. Despite demands by representatives of minority shareholders, Defendant PCI failed to discuss any relevant business issues and whether or not Defendant PCI would suspend Defendant Huang, and others, during the pendency of Jane Doe's lawsuit.

99. Defendant PCI also failed to provide any financial information to its shareholders. This is again failure of Defendant Huang and Defendant PCI to provide its minority shareholders with relevant business information. This is a blatant breach of Defendant Huang's fiduciary duty to Defendant PCI's minority shareholders.

100. On June 20, 2024, Plaintiffs Marino and DePietro made a demand upon PCI for the converted profits. See Ex. N. As is seen in this demand, Plaintiffs Marino and DePietro also requested access to corporate financial records and a list of shareholders along with an accounting of the shares each shareholder claims and the amount of compensation received by Defendant PCI in exchange for the shares. Defendants Huang and PCI have failed to respond to this demand.

101. As described in the complaint filed on behalf of Jane Doe which is attached here as Ex. B, Defendant Huang has been accused of reprehensible sexual misconduct.  And, this only threatens to further divert profits from Defendant PCI's minority shareholders to support Defendant Huang defense against Jane Doe's lawsuit. This makes it likely that additional conversion and theft of PCI profits will occur, further diverting away dividends owed to Plaintiffs Marino and DePietro, and other legitimate shareholders. As such, Defendant Huang converted PCI profits for his account and for the accounts of his co-conspirators and confederates as further alleged in Jane Doe's complaint.

102. Ex. C presents a list of damages incurred by Plaintiffs and which resulted from the direct actions of Defendant Huang. Ex. C is based on Plaintiffs direct knowledge and also on allegations included in Kasprzak's complaint (see Ex. A) and Jane Doe's complaint (see Ex. B). Defendant Huang, against the will of Plaintiffs, has converted for his own account or to the account of entities he controls and for the accounts of his friends, family, girlfriends, and mistresses at least $2,306,516,260 of PCI profits. To further break this down, $246,649,160 of Defendant PCI's profits were misappropriated by Defendant Huang, and his alter ego entities and his other confederates, before non-party Elliott's shares were redeemed by Defendant PCI. An additional $2,059,867,100 of Defendant PCI's profits were misappropriated by Defendant Huang, and his alter ego entities and his other confederates, after non-party Elliott sold his shares back to Defendant PCI.

103. A portion of these profits should have been paid as dividends to Plaintiffs. Plaintiff Marino has suffered at least $146,199,649 in proximate harm and Plaintiff DePietro has suffered at least $58,479,859 in proximate harm. These values do not include treble damages provided for conversion and civil theft of these dividends pursuant to California Penal Code § 496. Pursuant to California Penal Code § 496, Plaintiff Marino is entitled to $438,598,948 in restitution and Plaintiff DePietro is entitled to $175,439,579 in restitution. See Ex. C. Defendant Huang and PCI are liable under California Penal Code § 496 because these Defendants fully intended to permanently deprive Plaintiffs of their fair share of Defendant PCI's profits.

104. The amounts indicated in Ex. C represent only a portion of the damages suffered by Plaintiffs Marino and DePietro. Accordingly, a full accounting will be required to ascertain the full extent of Plaintiffs' damages.

105. Defendant Huang diverted these corporate profits as an obfuscated increase of his executive compensation, which was orchestrated without the approval

of other directors and hidden from Defendant PCI's legitimate minority shareholders.

## VII.    FRAUDULENT TRANSFERS

106.  Defendant Huang made countless transfers from Defendant PCI with the intent to hinder, delay, or defraud its shareholders of Defendant PCI's profits. In many cases, such transfers resulted in assets retained by Defendant PCI, but such transfers did not result in a reasonable equivalent value in exchange for the acquired assets. Defendant Huang engaged in these transfers with criminal intent and intent to permanently deprive PCI's shareholders of their fair share of profits.

107.  In many cases, assets acquired on behalf of Defendant PCI amounted to nothing more than additional executive compensation for Defendant Huang. Among these include purchase of real estate for use by Defendant Huang or his girlfriends and mistresses, exorbitant expenses for personal travel and payment for sexual services provided by Defendant Huang's girlfriends and mistresses.

108.  Defendant Huang also diverted Defendant PCI's profits to offshore accounts in his own name.

109.  All of these transfers were hidden from Defendant PCI's shareholders and also from its Board of Directors and corporate officers. Effectively, Defendant Huang is liable for conversion and civil theft of Defendant PCI's corporate profits to the detriment and harm suffered by Plaintiffs Marino and DePietro. As such, Plaintiffs Marino and DePietro are entitled to restitution and amount of which is subject to proof at trial, but at this juncture appears to be no less than $146,199,649 for Plaintiff Marino and no less than $58,479,859 for Plaintiff DePietro.

110.  Defendant Huang and Defendant PCI have converted and stole from Plaintiffs Marino and DePietro their fair share of corporate profits.

Defendants Huang and PCI are thus liable under California Penal Code § 496(c), which allows a claim to restitution in an amount three times that of actual harm suffered by Plaintiffs. Such treble restitution is subject to proof at trial, but at this juncture appears to be no less than $438,598,948 for Plaintiff Marino and $175,439,579 for Plaintiff DePietro.

### A. Overseas Safety Nets

111. Ex. P is a declaration executed by one of the original co-venturers, Kening Xu. Para. 8 of Mr. Xu's declaration recounts Defendant Huang's admission that Defendant Huang wire transferred $100 million to each of two separate accounts, one in Hong Kong and another in Singapore. Based on information and belief, these wire transfers totaling $200 million were affected without board approval and without disclosure to any shareholders.

112. These transfers are merely two notable fraudulent transfers, which were undertaken for the sole purpose evading payment of Defendant PCI's profits to its shareholders, including Plaintiffs Marino and the DePietro.

### B. Prima Air and Pegasus Aircraft

113. Again drawing from Mr. Xu's declaration, see Ex. P, ¶11, Mr. Xu introduced Defendant Huang to Ms. Tullberg. Ms. Tullberg and Defendant Huang now a codefendants charged with sexual malfeasance by Jane Doe's lawsuit.

114. Sometime in June 2022, Defendant Huang, along with Ms. Tullberg and Mr. Xu, formed a private aviation company called Prima Air Group, LLC.  Mr. Xu was forced out of Prima Air in January 2023. It is clear that Defendant Huang substantially controls Prima Air Group, LLC.

115. Sometime in late 2022, Defendant Huang also caused Defendant PCI to purchase one or more aircraft, which are used for Defendant Huang's personal use. Based on information belief, one of these aircraft's now held by Defendant PCI is a Boeing 737 business jet which plaintiffs believe was

acquired for approximately $70 million. The money for these aircraft came from Defendant PCI's profits to the detriment of its shareholders, including Plaintiffs Marino and the DePietro.

116. Defendant Huang then caused Prima Air to acquire the assets of Pegasus Elite Aviation. Based on information and belief, Pegasus assets were valued at approximately $500 million when they were acquired by Prima Air LLC, which is substantially controlled by Defendant Huang. Based on additional information and belief, Plaintiffs believe that title to several aircraft procured by Prima Air have been transferred to other shell companies controlled by Defendant Huang.

**C.    Other Stolen Profits**

117. Defendants Huang and PCI are liable for conversion and civil theft for a plethora of other fraudulent transfers. An accounting, to include detailed analysis of each and every transaction affected by Defendant Huang as he exerted sole and dictatorial control over Defendant PCI, is necessary to ascertain the true amount of harm sustained by Plaintiffs Marino and DePietro.

118. Some of these stolen profits were diverted to Defendant Huang's supposedly charitable foundation and ultimately were donated to his alma maters, including $20 million to Wuhan University's education and development foundation and $30 million to the University of Strathclyde. Of the monies donated to the University of Strathclyde, monies were invested in entrepreneurial ventures believed to be at least under partial control by Defendant Huang. See Ex. C. See also https://www.instrumentl.com/990-report/charles-huang-foundation.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

BREACH OF ORAL CONTRACT

(AGAINST DEFENDANT PASACA CAPITAL INC.)

119. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 117 as though fully set forth herein.

120. Plaintiffs Marino and Defendant PCI entered into a contract whereby Defendant PCI orally promised to purchase back from Plaintiff Marino 125,000 shares of Defendant PCI's common stock.

121. On April 27, 2023, Plaintiff Marino, in furtherance of all of his obligations under this oral contract, tendered to Defendant PCI all of his 125,000 shares of Defendant PCI's common stock. Even though Plaintiff Marino tendered his shares, Defendant PCI failed to purchase, or otherwise redeem Plaintiff Marino's PCI shares.

122. Plaintiff Marino was harmed by Defendant PCI's breach of this oral contract and this breach by Defendant PCI was a substantial factor causing Plaintiff Marino's harm.

123. Defendant PCI's breach of the oral contract was and is a direct and substantial factor causing Plaintiff Marino's harm in an amount of $12,500,000, less the original purchase price of his shares.

124. Because there is no market wherein Plaintiff Marino could sell his PC shares to a third party, Plaintiff Marino has no means to mitigate his harm.

125. Plaintiff DePietro and Defendant PCI entered into a contract whereby defendant PCI orally promised to purchase back from Plaintiff DePietro 50,000 shares of Defendant PCI's common stock.

126. On April 27, 2023, Plaintiff DePietro, in furtherance of all of his obligations under this oral contract, tendered to Defendant PCI all of his 50,000 shares of Defendant PCI's common stock. Even though Plaintiff DePietro tendered his shares, Defendant PCI failed to purchase, and otherwise redeem Plaintiff DePietro's PCI shares.

127. Plaintiff DePietro was harmed by Defendant PCI's breach of this oral contract and this breach by Defendant PCI was a substantial factor causing Plaintiff DePietro's harm.

128. Defendant PCI's breach of the oral contract was and is a direct and substantial factor causing Plaintiff DePietro's harm in an amount of $5,000,000, less the original purchase price of his shares.

129. Because there is no market wherein Plaintiff DePietro could sell his PC shares to a third party, Plaintiff DePietro has no means to mitigate his harm.

130. Plaintiffs Marino and DePietro are entitled to sue Defendant PCI directly because the breached contract was made between Defendant PCI and each of these Plaintiffs.

## SECOND CLAIM FOR RELIEF

CONVERSION WITH TREBLE DAMAGES

PURSUANT TO CALIFORNIA PENAL CODE § 496

(AGAINST ALL DEFENDANTS)

131. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 129 as though fully set forth herein.

132. Plaintiffs Marino and DePietro did and continue to have a right to possess the dividends that have been withheld by Defendants Huang, PCI, PCC, and CHF in that Defendant Huang exerted complete control over Defendant PCI's profits in order to pay to himself exorbitant executive compensation either directly to his own account or to his alter egos PCC and CHF or to his friends, family, girlfriends and mistresses.

133. Plaintiffs Marino and DePietro have a right to possess the dividends that have been withheld, and thereby converted and stolen, by Defendants Huang, PCI, PCC and CHF through his complete control over Defendant PCI and were used to purchase extravagant gifts, real property and other luxury items

including several airplanes all to fuel his own ego. All of the money for such purchases should have been declared as dividends. In order to enrich himself, these purchases amounted to additional executive compensation to Defendant Huang, either directly to his own account or to that of is solely-owned limited liability company PCC or to his purportedly charitable foundation CHF.

134. Plaintiffs Marino and DePietro have a right to possess the dividends that have been withheld by Defendants Huang and PCI through Defendant Huang's complete control over Defendant PCI and were frivolously invested in companies without any due diligence which amounted to a breach of his fiduciary duty and his duty to perform a reasonable inquiry before making investments as required by California law, Nevada law, and Defendant PCI's own bylaws. By making these frivolous investments, Defendant Huang and his alter egos have converted Plaintiffs' dividends.

135. Plaintiffs Marino and DePietro have a right to possess the dividends that have been withheld by Defendants Huang and PCI through his complete control over Defendant PCI caused $200 million of Defendant PCI's corporate profits to be transferred to offshore accounts in Hong Kong and Singapore thus diverting away from Plaintiffs Marino and DePietro their fair share of corporate profits. By so doing, Defendant Huang and his alter egos have converted these dividends in order to increase Defendant Huang's executive compensation to the detriment of all legitimate shareholders of Defendant PCI, including minority shareholders Plaintiffs Marino and DePietro.

136. Plaintiffs Marino and DePietro have unequivocally demanded return of these diverted PCI profits.

137. By depriving Plaintiffs Marino and DePietro of possession of these corporate profits, Defendant Huang, PCI, PCC, and CHF caused in excess of $146,199,649 in damages to Plaintiff Marino and in excess of an additional

$58,479,859 to Plaintiff DePietro. The amounts owed to Plaintiffs Marino and DePietro are merely estimates and a specific amount to be paid to Plaintiffs is subject to an accounting.

138. Defendant Huang, directly or through the altar-ego entities he controls including Defendant Pasaca Capital LLC and the nonprofit corporation Defendant CHF, intentionally diverted profits away from Plaintiffs Marino and DePietro in order to deprive them of their fair share of these profits and with the intent to permanently deprive them of possession thereof. All of these actions, taken with Defendant Huang's criminal intent of intent to permanently deprive Plaintiffs of possession of their share of PCI profits, amount to conversion and civil theft pursuant to California law.

139. Pursuant to California Penal Code § 496, Defendants Huang, PCI, PCC, and CHF are liable for treble damages. Thus, Defendants Charles Chunhua Huang, Pasaca Capital Inc., Pasaca Capital LLC, and the Chares Huang Foundation are jointly and severally liable for no less than $438,598,948 in restitution owed to Plaintiff Marino and an additional minimum amount of $175,439,579 in restitution owed to Plaintiff DePietro. These amounts are subject to an accounting and proof at trial.

140. Pursuant to California Penal Code § 496, Defendants Huang, PCI, PCC, and CHF are liable for attorneys' fees and cost of suit.

141. Plaintiffs Marino and DePietro have standing to bring a lawsuit against Defendant Huang on a direct basis pursuant to California and Nevada law because Defendant PCI is a close corporation and because Defendant Huang converted profits to inflate is own executive compensation.

### **THIRD CLAIM FOR RELIEF**

BREACH OF FIDUCIARY DUTY TO

MINORITY BY MAJORITY SHAREHOLDER

31

(AGAINST DEFENDANT CHARLES CHUNHUA HUANG)

142.   Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 140 as though fully set forth herein.

143.   Defendant Huang, either as a legitimate majority shareholder or an individual exerting complete control over Defendant PCI as a majority shareholder, owes a fiduciary duty to minority shareholders, including Plaintiffs Marino and DePietro. One such fiduciary duty owed by Defendant Huang as a director and alleged majority shareholder is that of treating a minority shareholder fairly and in good faith in a manner that benefits all shareholders proportionally.

144.   Plaintiffs Marino and DePietro have standing to bring a lawsuit against Defendant Huang on a direct basis pursuant to California and Nevada law.

145.   Defendant Huang has, on a continuous basis since Plaintiffs became minorities shareholders, diverted corporate profits away from other shareholders in order to unjustly enriched himself and to pay himself, either directly or through his alter ego entities, exorbitant executive compensation without the approval of the Board of Directors and Defendant PCI's shareholders.

146.   By depriving Plaintiffs Marino and DePietro of possession of these corporate profits, Defendant Charles Chunhua Huang caused in excess of $146,199,649 in harm to Plaintiff Marino and an additional minimum harm of $58,479,859 in damages to Plaintiff DePietro. Restitution in these amounts is proper.

147.   These amounts are subject to an accounting and proof at trial.

148.   Plaintiffs Marino and DePietro have standing to bring a lawsuit against Defendant Huang on a direct basis pursuant to California and Nevada law because Defendant PCI is a close corporation and because Defendant Huang converted profits to inflate is own executive compensation.

**FOURTH CLAIM FOR RELIEF**

BREACH OF FIDUCIARY DUTIES OF

CARE, LOYALTY AND CANDOR TO

PASACA CAPITAL INC.

(AGAINST DEFENDANT CHARLES CHUNHUA HUANG)

149. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 147 as though fully set forth herein.

150. Defendant Huang, as the purported majority shareholder of Defendant PCI, owed a fiduciary duties to Defendant PCI, including duties of care, loyalty and candor.

151. Even though Defendant PCI was supposedly controlled by a board of directors, Defendant Huang controlled the board of directors through his purported equity resulting in a domineering control over each member of the Board of Directors and Defendant PCI itself.

152. Defendant Huang breached his duty of care to Defendant PCI by directing corporate profits into frivolous investments with his friends, family, girlfriends and mistresses. Defendant Huang made these frivolous investments without any guidance by Plaintiffs Marino and DePietro and without any guidance by non-parties Elliott and Kasprzak and without even a scintilla of due diligence. Such actions by Defendant Huang are violative of Cal. Corp. Code §§ 309(a) and Cal. Corp. Code § 309(b) and indirect contravention of California and Nevada law.

153. Defendant Huang also breached his duty of loyalty by directing corporate profits away from PCI's legitimate shareholders in order to fund his supposedly philanthropic activities through his non-profit foundation that bears his own name. Many of the "grants" disseminated by Defendant Charles Huang Foundation were directed to entrepreneurial ventures in conflict with

Defendant PCI's *raison d'être*, which was to invest in such entrepreneurial ventures. By failing to disclose these usurped investment opportunities to Defendant PCI and to its shareholders, including minority shareholders Plaintiffs Marino and DePietro, Defendant Huang also breached his duties of candor and loyalty. See Ex. O.

154. Based on information and belief, Defendant Huang also reserved unto his own account equity in start-up ventures funded through Defendant Charles Huang Foundation.

155. Defendant Huang's breached fiduciary duties of care, loyalty and candor have caused harm to Defendant PCI, which resulted to direct and proximate harm in excess of $146,199,649 in harm to Plaintiff Marino and an additional minimum harm of $58,479,859 in harm to Plaintiff DePietro.

156. Restitution in these amounts is subject to an accounting and proof at trial.

157. Defendant Huang cannot hide behind the business judgment rule because all of his breaches of fiduciary duties are evidenced by actions taken by Defendant Huang in bad faith, without any supportive due diligence to ensure the safety of investments, or for the purposes of obfuscating payments to his own account or to the account of his confederates.

158. Because Defendant PCI is a close-corporation, Plaintiffs Marino and DePietro have standing to bring a direct claim against Defendant Huang on behalf of defendant PCI and on behalf of its shareholders. This is permissible pursuant to California and Nevada law.

## FIFTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

### (AGAINST DEFENDANTS HUANG AND PCI)

159. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 157 as though fully set forth herein.

160. Defendant PCI, with the approval of Defendant Huang, agreed to redeem PCI shares from Plaintiffs Marino and DePietro at a price of $100 per share.

161. Plaintiffs Marino and DePietro tendered their shares to Defendant PCI in hopes of receiving the agreed-upon price of $100 per share.

162. Defendant PCI, at the direction of Defendant Huang, refused to purchase PCI shares from Plaintiffs Marino and DePietro. By failing to purchase PCI shares, Plaintiffs Marino and DePietro have been unjustly harmed because these shares cannot be sold to a third party. The shares cannot be sold to a third party because Defendant Huang has dominated control over defendant PCI to the extent that there is no possibility of a market in which to sell Plaintiffs' shares in Defendant PCI.

163. The harm suffered by Plaintiffs directly corresponds to an unjust enrichment to both Defendants Huang and PCI. Because Plaintiffs are not able to sell the shares because they are essentially worthless, Defendants Huang and PCI will reap an unjust windfall amounting to $17,500,000, of which $12,500,000 is based on harm suffered by Plaintiff Marino and $5 million of which is based on harm suffered by Plaintiff DePietro.

164. Defendant PCI, with the approval of Defendant Huang, also failed to pay dividends to minority shareholders Plaintiff Marino and DePietro. The harm suffered by Plaintiff Marino resulting from unpaid dividends amounts to $146,199,649. The harm suffered by Plaintiff DePietro resulting from unpaid dividends amounts to $58,479,859. The harm suffered by Plaintiff Marino and DePietro corresponds to an unjust enrichment to both Defendants Huang and PCI in an amount of $146,199,649 suffered by Plaintiff Marino and in an amount of $58,479,859.

165. These amounts are subject to an accounting and proof at trial.

166. It would be inequitable for Defendants Huang and PCI to retain the benefit of such malfeasances as described herein resulting in unjust enrichment and

a windfall corresponding to direct and proximate harm sustained by Plaintiffs Marino and DePietro. Accordingly, Plaintiffs are entitled to full restitution.

**SIXTH CLAIM FOR RELIEF**

FRAUDULENT TRANSFER

PURSUANT TO CAL. CIV. CODE § 3439 ET SEQ.

(AGAINST DEFENDANT HUANG)

167. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 165 as though fully set forth herein.

168. Pursuant to Cal. Civ. Code § 3439.01, Plaintiffs Marino and DePietro, as minority shareholders of Defendant PCI, are creditors having claims against debtor and Defendant Huang. This is true even though Plaintiffs' claims have not yet been reduced to a judgment.

169. On information and belief, Defendant Huang has purposefully hidden PCI's assets by transferring money to overseas bank accounts and by using hundreds of millions of dollars to pay for personal residences, aircraft, and other luxuries solely for himself and his own enjoyment, and salary, clothing, vehicles, jewelry, and residences for his girlfriends.

170. On information and belief, Defendant Huang has purposefully hidden PCI profits from its shareholders by frivolously investing these profits, without any due diligence whatsoever, with companies managed by his family, friends, girlfriends and mistresses. These investments were affected in order to further line Defendant Huang's pockets and the accounts of his Confederates including family, friends, girlfriends and mistresses. The total amount of these investments and other expenditures is subject to an accounting is prayed for herein.

171.  Defendant Huang has purposefully hidden PCI profits from its shareholders by transferring at least $200 million of PCI assets and profits to overseas accounts which will be out of reach of PCI's creditors, including Plaintiffs Marino and DePietro. Now, all of these overseas assets, which rightfully belong to the shareholders of Defendant PCI, are under Defendant Huang's exclusive control and must be rescinded. These monies must be ordered transferred back to the United States and placed under control of Defendant PCI's board of directors without interference by Defendant Huang.

172.  Defendant Huang has purposefully hidden PCI profits from its shareholders by purchasing a Boing business jet for $70 million and also purchasing a private jet charter company in an amount believed to be in excess of $500 million. All of this was intentionally affected in order to preclude Plaintiffs from collecting on their claims against debtor and the Defendant Huang.

173.  And, more importantly, all of these transfers of PCI assets and profits, either in the form as "investments" or in the form of direct cash transfers to overseas accounts, have been affected with actual intent to hinder, delay, defraud and/or avoid payment to Defendant PCI's creditors, including Plaintiffs Marino and DePietro.

174.  Because all of these transfers were made fraudulent by the intent of Defendant Huang and his alter ego Defendant PCI, Plaintiffs Marino and DePietro are entitled to have any or all of such transfers set aside in order to satisfy their claims against Defendants Huang and PCI.

175.  At the very least, Plaintiff Marino is entitled to set aside any transfers in order to satisfy his claim for restitution in the amount of at least $146,199,649.

176.  At the very least, Plaintiff DePietro is entitled to set aside any transfers in order to satisfy his claim for restitution in the amount of at least $ 58,479,859.

177. The amounts owed to Plaintiffs Marino and DePietro are subject to an accounting and proof at trial.

### SEVENTH CLAIM FOR RELIEF

INJUNCTION TO PRESERVE ASSETS

(AGAINST ALL DEFENDANTS)

178. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 176 as though fully set forth herein.

179. Plaintiffs Marino and DePietro seek equitable relief in the form of restitution for monies stolen by Defendants Huang and Pasaca Capital, Inc. These monies should have been distributed as dividends. Instead, Defendant Huang and, through Defendant Huang's dictatorial control, Defendant Pasaca Capital, Inc. diverted these dividends to the accounts of Defendant Huang himself or to the accounts of entities he controls or to the accounts of his family, friends, girlfriends and mistresses. All of these diverted dividends effectively amount to additional executive compensation to Defendant Huang was not authorized by Defendant PCI's Board of Directors or its shareholders.

180. Because of the nefarious nature of these actions, and because Defendant Huang conducted these actions with the intent to permanently deprive Defendant PCI's shareholders of their fair share of corporate profits, the gravamen of Plaintiffs' complaint rests on conversion and civil theft and restitution is properly required.

181. Plaintiffs are also entitled to set aside all fraudulent transfers that were made either to defendant Huang, entities he controls, entities that he holds equity in, his friends, his family, his friends, his girlfriends, and his mistresses.

182. And, as shown by evidence presented thus far, Defendant Huang is willing to defraud Defendant PCI's shareholders for his own benefit. Plaintiffs are entitled to an injunction to preclude dissipation of assets controlled, either

directly or indirectly, by Defendant Huang. Such injunction is requested on a permanent basis, and Plaintiffs intend to seek a preliminary injunction in due course.

## **EIGHTH CLAIM FOR RELIEF**

### FOR AN ACCOUNTING

### (AGAINST DEFENDANT PCI)

183. Plaintiffs Marino and DePietro incorporate by reference the allegations of paragraphs 1 through 181 as though fully set forth herein.

184. Plaintiffs Marino and DePietro minority shareholders holding shares in Defendant PCI. Plaintiff has requested from Defendant PCI financial records in order to ascertain the amount of profits that defendant PCI has earned since Plaintiffs Marino and DePietro became shareholders.

185. Defendant PCI, under Defendant Huang's exclusive control, has failed to provide any financial records to enable Plaintiffs Marino and DePietro to ascertain the amount of profits earned by Defendant PCI since Plaintiffs Marino and DePietro became shareholders.

186. Defendant PCI has failed to pay dividends to Defendant PCI based on a percentage of profits earned by Defendant PCI earned since Plaintiffs Marino and DePietro became shareholders.

187. The only way for Plaintiffs Marino and DePietro to ascertain the amount of money owed to them is by means of an accounting.

188. Plaintiffs Marino and DePietro are as such entitled to an accounting in order to enable them to ascertain the amount of monies owed to them by Defendant Pasaca Capital Inc. and in light of shareholder equity actually outstanding. Ergo, such accounting must include enumeration of PCI shareholders and consideration for equity paid by each shareholder.

189. Because of the fraudulent transfers affected by Defendant Huang, an accounting is required from every entity he controls where such control was acquired by Defendant Huang using stolen PCI profits.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs Marino and DePietro request that this Court find in their favor and against Defendants Charles Chunhua Huang, Pasaca Capital Inc., Pasaca Capital LLC, and Chares Huang Foundation and grant Plaintiffs the following relief:

A. That Judgment in favor of Plaintiff Marino against Defendants for actual harm in an amount not less than $146,199,649 in restitution, subject to an accounting and proof at trial;

B. That Judgment in favor of Plaintiff Marino be increased to an amount of $438,598,948 in restitution pursuant to Cal. Penal Code § 496, subject to an accounting and proof at trial;

C. That Judgment in favor of Plaintiff Marino for actual damages in the amount of $12,500,000, less the original purchase price of his shares, against for Defendant Pasaca Capital, Inc. for breach of oral contract;

D. That Judgment in favor of Plaintiff DePietro against Defendants for actual harm in an amount not less than $ 58,479,859 in restitution, subject to an accounting and proof at trial;

E. That Judgment in favor of Plaintiff DePietro be increased to an amount of $175,439,579 in restitution pursuant to Cal. Penal Code § 496, subject to an accounting and proof at trial;

F.  That Judgment in favor of Plaintiff DePietro for actual damages in the amount of $5,000,000, less the original purchase price of his shares, against for Defendant Pasaca Capital, Inc. for breach of oral contract;

G.  That Plaintiffs Marino and DePietro be awarded their attorneys' fees;

H.  That Plaintiffs Marino and DePietro be awarded costs and expenses in this action;

I.  An award of pre-judgment and post-judgment interest;

J.  An order to set aside all transfers from any Defendant to any other party, including to Defendant Huang of entities he controls, as necessary to satisfy Plaintiffs' claims for relief;

K.  For a preliminary and a permanent injunction enjoining all Defendants from continuing to dissipate assets;

L.  For a preliminary and a permanent order requiring Defendants Huang and Pasaca Capital Inc. to recover and move to bank accounts in this state any monies fraudulently transferred;

M. For a preliminary and a permanent order precluding Defendant Huang, either directly or indirectly, from controlling any assets belonging to Defendant PCI or any other entity controlled by Defendant Huang;

N.  An order requiring an accounting and access to all financial and shareholder records of all Defendants and all entities controlled by Defendant Huang or his alter egos where such control was acquired using profits stolen by Defendant Huang from Defendant Pasaca Capital Inc.

O.  Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: July 11, 2024

Respectfully submitted,

/s/ Jack I. Jmaev
SBN 216,416
Attorney for Plaintiff
Puritan Law
500 N. State College Blvd.
Suite 1100
Orange, CA 92868

COMPLAINT